OPINION
This case is before us on the interlocutory appeal of Aaron Sikora from a summary judgment granted in favor of Tom Wenzel. In support of the appeal, Sikora raises the following assignments of error:
I. The trial court erred in its determination that notice is required for a landlord to be in violation of O.R.C. 5321.04(A)(2) and therefore [be] negligent per se.
II. The trial court erred by granting summary judgment on behalf of Defendant-Appellee in that reasonable minds could differ as to whether or not Defendant-Appellee had notice that the deck was defective and/or hazardous.
After considering the record and the applicable law, we conclude that the first assignment has merit, but the second assignment of error does not. Accordingly, the judgment of the trial court is reversed and this case is remanded for further proceedings. A brief discussion of our opinion follows.
 I
Both sides in this appeal agree that the relevant facts on the issue of the landlord's notice are essentially undisputed. According to the parties, Aaron Sikora was injured on September 21, 1996, while attending a party at a condominium located at 1369 Cimarron Circle in Fairborn, Ohio. Sikora's injury resulted from the collapse of a deck attached to the condominium. At the time of the collapse, Tom Wenzel owned the condominium, which had been built in 1986 by Lovins Construction. Wenzel had owned the condominium for investment purposes from the time of its original construction and had rented it to various tenants. On the day of the collapse, at least four tenants lived at the condominium, including Chris Bakros, Joe Gilkerson, John Avia, and Jeff Poepellman.
The condominium was built as part of a larger project (Zink Road Manor) constructed by Lovins. On August 28, 1986, the City of Fairborn issued a permit to Lovins for the erection of one of the buildings in the project, a six-unit structure that included 1369 Cimarron Circle. The original plans that Lovins gave the City for Zink Road Manor did not include decks; instead, concrete slab walkouts were proposed. However, at some point after construction of the project began, Lovins decided the grades were not right for concrete slabs. As a result, the plans were changed to include basements with decks. In fact, on September 17, 1986 (less than a month after the permit was issued), the purchase contract signed by Wenzel and Lovins stated that the proposed unit at 1369 Cimarron Circle would include a walk-out basement, a patio with a storage shed, and a deck above the patio.
The City was never notified of the design change and no revised plans were given to the City. Instead, City inspectors discovered on a site visit that Lovins was building decks. At that time, Robert Price, the City's Chief Building Inspector, did not issue a stop work order. When Price spoke to Lovins about the decks, Lovins said he was going to continue building decks because he had to meet a completion date at the end of the year. Price expressed concern to Lovins about having an architect sign off on the decks.
Subsequently, on December 8, 1986, Lovins met with Price to resolve Price's concerns about the decks. At that time, Lovins gave Price a document showing a design for the decks. However, the document had not been prepared by an architect. At the meeting, Price rejected the document because it lacked sufficient information about the design. Specifically, the drawing did not show how posts and foundations were going to be provided, nor did it show the size of beam members, the size of floor joist members, or what connections would be used for the decks. One specific point identified by Price at the meeting was an apparent problem with over-spanning on the beams. Over-spanning means that the beams spanned too great a distance to support the load the beams should carry. Another specific point Price made at the meeting was that connections should be bolted rather than nailed. According to Price, bolting prevents failure by holding the structure together with a significant bolt rather than with a thin nail. As a result of the meeting, Lovins understood the City needed something from an architect on the proper design of the decks.
After the meeting, the City never received any drawings for the deck design from a registered architect. Inexplicably, the City issued a certificate of occupancy on December 28, 1996, without having conducted any inspection of the decks. The certificate was issued despite Price's knowledge that code violations existed. According to Price, Lovins was responsible for obtaining compliance and had promised something would be forthcoming from Lovins' architect to resolve the issue. The record does not indicate exactly when Wenzel took possession of the condominium or when renters first occupied the premises. However, the record does contain a settlement statement for the condominium, which is dated December 31, 1986. In any event, Price received a letter from Ronald Booth of Homarama Design in February, 1987. In the letter, Booth said the wood decks would receive concrete footers as requested. Booth also expressed an opinion that the structural capacity of the deck, as constructed, would meet the load requirements of the building code. After receiving the letter, Price sent an inspector out to see that the footers had been put in place. However, the inspector was not asked to note any type of connection problems. According to Price, an inspector can tell if a finished deck is bolted or nailed together by simply looking at the deck. Instead of having anyone check the connections, Price relied on Booth's letter as proof that someone who was competent had examined the situation. At the time, Price assumed Booth was a registered architect, when he was not.
No evidence in the record indicates that Wenzel was aware of this dispute or that Wenzel had any knowledge of any defect in the deck. Additionally, the four tenants in possession at the time of the collapse testified that the deck appeared sturdy and had no signs of neglect. The tenants also said they had never notified Wenzel of any defects.
After the deck collapsed, two engineers reviewed the deck and came up with different conclusions about why the deck failed. An engineer sent by an insurer concluded that the cause of the collapse was the failure of the connection of the beam to the post. Price agreed with this assessment, and stated that the deck collapsed because the connection was nailed instead of being bolted. Because of concerns about the stability of the remaining decks at Zink Road Manor, the City asked Pretzinger Klenke, Inc., Consulting Engineers, to investigate. Robert Pretzinger told Price that the primary cause was the failure of a 2x10 foot beam section supporting the right side of the deck. At the failure point, less than 3 inches of wood were available to carry any load imposed, due to diamond shaped knots in the top and bottom of the beam. These knots pointed in a direction such that only a few inches of wood separated the knots. Pretzinger also found that the double member beams of the deck were not adequately tied together. The beams were supported by hangers and the nails used were not the type needed for the full capacity of the hangers. As a result, the capacity of the hangers was seriously reduced. None of the connections were capable of carrying the design load required by the building code, including all hangers and all nailed joints.
After receiving Pretzinger's report, Price concluded that the remaining decks were subject to structural failures as well. Consequently, the City issued an emergency order forbidding any use of the decks, other than for emergency exit purposes, until the decks were repaired or replaced. Again, Wenzel had no notice of any of these defects before the collapse.
The trial court found that Wenzel was not liable as a matter of law because Wenzel had neither actual nor constructive notice of the defects in the deck. Sikora challenges this holding, claiming that actual or constructive knowledge or notice is not needed before a landlord can be held liable for defects in rental premises. Sikora's argument is based on a distinction between R.C. 5321.04(A)(2) and R.C. 5312.04(A)(1). According to Sikora, R.C. 5321.04(A)(2) uses language typical of common law premises liability cases. By contrast, R.C. 5321.04(A)(1) involves the violation of a second statute, or as Sikora calls it, "negligence per se within negligence per se." In this regard, Sikora appears to contend that notice is not required if the landlord violates a specific statutory duty as opposed to a more general common law duty like keeping the premises in a habitable condition. As applied to the present case, the specific claim would be that violating a statutory duty imposed for the safety or protection of the public justifies charging the landlord with what is essentially strict liability.
Under R.C. 5321.04(A), a landlord who is a party to a rental agreement must, among other things:
 (1) Comply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety;
 (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition.
In Shroades v. Rental Homes, Inc. (1981), 68 Ohio St.2d 20, the Ohio Supreme Court considered the duty of landlords under R.C.5321.04(A)(2) to "make repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." As a factual matter, the landlord in Shroades had received at least constructive notice that two steps on the stairs of a rental property were broken, but failed to make repairs. Shortly thereafter, a tenant was injured by the collapse of a third step on the stairs. In holding that suit could be maintained against the landlord, the court said:
 [a] landlord is liable for injuries, sustained on the demised residential premises, which are proximately caused by the landlord's failure to fulfill the duties imposed by R.C. 5321.04. * * *
 Furthermore, the purpose of the statute is to protect persons using rented residential premises from injuries. A violation of a statute which sets forth specific duties constitutes negligence per se. * * * However, in addition to negligence per se, proximate cause for the injuries sustained must be established. * * * Also it must be shown that the landlord received notice of the defective condition of the rental premises, that the landlord knew of the defect, or that the tenant had made reasonable, but unsuccessful, attempts to notify the landlord.
Id. at 25-26 (citations omitted).
As we mentioned, a potential justification for holding landlords strictly liable under R.C. 5321.04(A)(1) is that such a violation involves breach of a specific statutory duty rather than violation of a more general rule of conduct. In such situations, the law generally provides that:
 `[w]here a specific requirement is made by statute and an absolute duty thereby imposed, no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care. In such a situation, the obligation and requirement has been fixed and established by law, and the conduct of any person which is violative of such specific statutory requirement is illegal, and, if it proximately results in injury to one to whom a legal duty is owed, the transgressor is liable for the resulting damage. In such case, the jury is not called upon to determine whether the conduct constituted negligence; it determines only whether the act prohibited was committed or the act required by law was omitted, as the case may be. The violator of such specific requirement of law is liable, irrespective of the question as to whether his act is such as is deemed to meet and satisfy the test of ordinary or reasonable care which would be applied in the absence of such statutory definition and imposition of absolute duty, such as, for instance, the absolute and specific requirement as to headlights. Where the standard of duty is thus fixed and absolute, it being the same under all circumstances, the failure to observe that requirement is clearly negligence per se. But, where duties are undefined, or defined only in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances, the phrase `negligence per se' has no application.'
Ornella v. Robertson (1968), 14 Ohio St.2d 144, 149 (citations omitted).
Shroades involved a R.C. 5321.04(A)(2) violation, or an undefined or general duty to "make repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." 68 Ohio St.2d at 25. However, courts applyingShroades have not confined the notice requirement to (A)(2) violations. In fact, some courts have applied notice and have also explicitly rejected a strict liability approach to R.C.5321.04(A)(1) violations. For example, in Winston Properties v.Sanders (1989), 57 Ohio App.3d 28, the First District considered a landlord's liability for allowing lead-based paint to remain on premises in violation of Cincinnati Board of Health Regulations. Relying on Shroades, the court first found that the landlord must have had either actual or constructive notice of the defective condition. Id. at 29. Additionally, the court held that the landlord was not strictly liable because neither the health ordinances nor R.C. 5321.04 created strict civil liability. Id. at 30. Notably, the court did not discuss the basis for these conclusions.
In Brady v. Koehnke (Sept. 7, 1994), Hamilton App. No. C-93020, unreported, the First District again held the notice requirement applicable where a tenant had claimed that a porch step/stairway configuration violated the Ohio Basic Building Code (OBBC). As in Winston, the court simply cited Shroades and did not elaborate on its reasoning. A further persuasive point for the court in Brady may have been the fact that the alleged defects did not proximately cause the tenant's injuries. Specifically, the tenant did not try to use the porch step when exiting the building. Id. at p. 3.
Similarly, in Rice v. Reid (April 23, 1992), Crawford App. No. 3-91-34, unreported, the Third District read Shroades broadly to require notice in an (A)(1) situation. In Rice, the tenants claimed their landlord was negligent per se in failing to comply with building, housing, and safety codes. The violation in question was the allowance of lead-based paint on the property. However, the Third District rejected this argument, commenting that:
 Shroades, supra, expressly * * * stated that although a violation of R.C. 5321.04 constitutes negligence per se, before liability can be imposed on the landlord the tenant must also establish that her injuries were proximately caused by the landlord's violation of R.C. 5321.04 and that the landlord had notice of the problem.
Id. at p. 2. The court then affirmed the summary judgment in favor of the landlord, based on the landlord's lack of actual or constructive notice of the paint. Again, beyond making the above comments, the court did not explain its reasoning.
In Lockhart v. Mayfield (Sept. 18, 1991), Summit App. No. 14990, unreported, jurisdictional motion overruled, 63 Ohio St.3d 1406
(1992), the Ninth District considered a case in which a fire was caused by a faulty metal chimney that allowed flames to come into contact with wood and building materials. According to the evidence, the fireplace was not installed according to code, no firestops were installed, and no building permit was issued for the fireplace or chimney. Once again, despite these (A)(1) violations, summary judgment in the landlord's favor was affirmed based on Shroades and the landlord's lack of actual or constructive notice. Additionally, the Ninth District citedWinston for the fact that R.C. 5321.04 does not create strict civil liability. Subsequently, the Ninth District again applied the notice requirement in Primes v. Milby (Nov. 19, 1997), Summit App. No. 18236, unreported. In Primes, the injury was allegedly caused by a OBBC violation, i.e., the stairway was not equipped with a continuous guard or handrail on both sides. In spite of this specific violation of a building code requirement, the landlord would have escaped liability, except for issues of fact concerning whether the landlord had notice of the lack of a second handrail. Id. at p. 3.
By way of contrast, our own district has declined to impose a notice requirement in a case involving an (A)(1) violation. See,Kroeger v. East End Constr. Co., Inc. (Mar. 2, 1994), Montgomery App. No. 10480, unreported. As a preliminary point of discussion, we note that Kroeger is factually indistinguishable from the present case. Specifically, in Kroeger, the landlord contracted with an independent contractor to have a rooming house and an attached deck built. A building permit was issued for the rooming house, but a deck was not included in the original drawings. An occupancy permit was apparently issued by the City of Dayton, as the house was rented to students. During a party, when about thirty people were on the deck, the deck suddenly collapsed and severed the plaintiff's left big toe. The collapse was attributed to the deck's failure to comply with code requirements for the City of Dayton. In the trial court, the landlords obtained summary judgment based on their lack of knowledge of the deck's dangerous condition. We reversed, finding the landlords potentially liable under Strayer v. Lindeman (1981), 68 Ohio St.2d 32.
Strayer was issued the same day as the Shroades decision. InStrayer, the court held that "when a landlord employs an independent contractor to make repairs in compliance with the statutory duties imposed by Chapter 5321, the landlord cannot thereby insulate himself from liability arising out of the negligent performance of those repairs." Id. at 36. The factual situation in Strayer was that the landlord had employed a independent contractor who negligently caused a fire while making a plumbing repair. In finding the landlord liable, the court focused on the landlord's duty under R.C. 5321.04(A)(2) to make repairs, and on the concept that "an employer may be held to duties which he cannot delegate to another, and in those cases he is liable for their nonperformance or negligent performance even though he employs an independent contractor." Id. at 34 (citation omitted). Notice was not mentioned as a prerequisite for the landlord's liability.
Relying on Strayer, our court concluded in Kroeger that "[a]s notice is not required under the rule of Strayer to hold the contractor liable for its own negligent acts, notice of the defect is not required to impute that liability to the landlord." Id. at p. 3. We also held in Kroeger that the negligence of the independent contractor could be imputed to the landlord. Id.
Consistent with this theory and with Strayer, the Ohio Supreme Court found the landlord potentially liable for the acts of a third party in Shump v. First Continental-Robinwood Assoc. (1994), 71 Ohio St.3d 414. In Shump, a Dayton City Ordinance required the installation of smoke detectors in certain places in apartments. The landlord hired an independent contractor to install smoke alarms, but the contractor allegedly failed to install a smoke detector on the lower level of the apartment as required by the ordinance. Subsequently, a tenant and guest were killed in a fire in one of the apartments. The court concluded the landlord would be liable for this breach of a statutory duty, stating that:
 [a] landlord may not shift to an independent contractor the responsibility of complying with laws designed for the physical safety of others. Such duties are nondelegable. Restatement of the Law 2d, Property, supra, Section 19.1, provides: "A landlord who employs an independent contractor to perform a duty which the landlord owes to his tenant to maintain the leased property in [a] reasonably safe condition is subject to liability to the tenant, and to third persons upon the leased premises with the consent of the tenant, for physical harm caused by the contractor's failure to exercise reasonable care to make the leased property reasonably safe." 2 Restatement of the Law 2d, Torts, supra, Section 424, states: "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."
Id. at 421.
Although Shump did not explicitly comment on R.C.5321.04(A)(1), that section of the statute was clearly involved. As the court noted in Shump, the smoke detector ordinance was a safety ordinance, designed to "protect any individual in an apartment from the risks created by fire." This echoes the requirement in R.C. 5321.04(A)(1) that the landlord must "[c]omply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety." Furthermore, like Strayer, Shump did not mention notice as a prerequisite for the landlord's liability. Instead of relying on the landlord's knowledge, these cases impose a type of strict liability, even though the liability is phrased in terms of imputed liability.
A potential point of distinction might be that Strayer andShump involve repairs or added components (like smoke alarms) rather than the original construction of rental premises. However, we see little difference in the hiring of an independent contractor for one of these purposes as opposed to another. Regardless of the context, the landlord has a statutory duty to comply with laws designed for the physical safety of others. While building or safety codes at times impose general standards of conduct, they also impose specific requirements for all premises, such as the installation of smoke alarms in certain places, load requirements for structures, including balconies and decks, and even prohibitions against the use of lead-based paint.
Upon consideration, we see no way to reconcile our decision in Kroeger with other cases interpreting R.C. 5321.04(A)(1), nor do we believe the Supreme Court cases can be reconciled with each other. In this vein, one difficulty in applying Shroades is the court's addition of a negligence factor (notice) to a negligence per se situation. As we pointed out earlier, negligence per se typically does not require consideration of whether a party's conduct has been negligent. Instead, "[t]he violator of such specific requirement of law is liable, irrespective of the question as to whether his act is such as is deemed to meet and satisfy the test of ordinary or reasonable care which would be applied in the absence of such statutory definition and imposition of absolute duty." Ornella, 14 Ohio St.2d at 149. More specifically, the fact that R.C. 5321.04 imposes statutory duties does not mean that any violation of the statute is negligence per se. Instead, the focus should be on whether the standard of duty under the statute is "fixed and absolute," or is defined in "abstract or general terms." Id. In the former situation, the violation would be negligence per se, meaning that deviation from standards of reasonable care need not be proven. By contrast, in the latter situation, traditional negligence concepts like notice would be appropriately applied. Given the facts in Shroades, the court's addition of a negligence factor is understandable, since the landlord had at least constructive notice of a defect, and perhaps actual notice, but did not remedy the defect. This is akin to a common law negligence situation. However, the same situation does not exist where the landlord is required by statute to comply with building or safety codes that, in turn, impose absolute duties.
In this regard, we see no practical distinction between the ordinance governing smoke detectors that was involved in Shump and the OBBC load requirements that apply to the present case. Under R.C. 3781.10, the board of building standards is required to adopt lawful minimum requirements for buildings like the condominium owned by Wenzel. Per this authority, Ohio's board of building standards has incorporated the BOCA National Building Code, among other things, and has called these requirements the Ohio Basic Building Code. See, Ohio Adm. Code 4101:2-1-03. At the time the deck was built, the OBBC uniform live load requirement for decks (exterior balconies) was 60 pounds per square foot. See, Bletzacker's OBBC Study Guide (2d Ed. 1990), Section 7.2.2.1; former Ohio Adm. Code 4101:2-11-06; BOCA National Building Code (9th Ed. 1984), Article 9, Table 906, at 157, and BOCA Basic Building Code (7th Ed. 1978), Article 7. Table 706, at 202. In line with the OBBC requirement, Ronald Booth of Homarama Design assured the City of Fairborn in 1987 that the deck would support the required load of 60 pounds per square foot "without any trouble."
Load requirements for decks are obviously imposed for the purpose of protecting people from the type of collapse that occurred in the present case. These requirements were incorporated by reference by the legislature into R.C.5321.04(A)(1) and form part of the landlord's statutory duty. As a result, the duty is one the landlord cannot delegate, and it matters not whether the defect occurred in the original construction of the building or by way of a later addition. In either situation, the landlord is strictly liable for the violation of the statutory duty. Moreover, the landlord cannot escape liability by claiming that the injury was caused by the negligent acts of a contractor or by the negligence of the code-enforcing authority.
As final point, we note that in Chambers v. St. Mary's School
(1998), 82 Ohio St.3d 563, the Ohio Supreme Court held that "[t]he violation of an administrative rule does not constitute negligence per se." Id. at syllabus. According to the court, negligence per se is not appropriate in such situations because the administrative process does not involve the "collaborative effort of public officials" and is not accountable to the public. Id. at 568. Because of this distinction between the legislative and administrative processes, the court felt a legislative enactment could give rise to negligence per se, but an administrative regulation could not. Of particular interest is the fact that the regulations at issue in Chambers were administrative standards adopted as part of the Ohio Basic Building Code.
Chambers was not mentioned by the parties to this appeal either in their briefs or during oral argument. At first blush,Chambers might seem fatal to Sikora's position. However, in our opinion, Chambers is distinguishable and has no effect on the present case. As a preliminary point, Chambers did not involve a landlord's liability for injuries occurring on rental premises. More important, it did not involve the statutory duty given by the legislature to landlords, i.e., the duty to "[c]omply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety." As we mentioned above, R.C. 5321.04(A)(1) incorporates the requirements of these codes into the statute by reference. Thus, the specific duty of the landlord is not based on the decision of an administrative agency but is the result of a legislative determination that landlords will comply with certain codes. Because the members of the General Assembly are accountable to their constituents, and the policy determinations in R.C. 5321.04
are subject to change by citizens through the elective process, the concerns expressed in Chambers have no bearing on the case at hand.
Accordingly, based on Shump, Strayer, and our own decision inKroeger, we find that the trial court erred in awarding summary judgment in favor of Wenzel. Even if Wenzel did not have actual or constructive notice of the defect in the deck, Wenzel is strictly liable for the violation of the OBBC as incorporated in R.C. 5321.04(A)(1), assuming the violation proximately caused injury to Sikora. Wenzel is also liable on the basis of imputed liability for the acts of those who may have negligently designed or constructed the deck.
In light of the preceding discussion, the first assignment of error is sustained.
 II
The second assignment of error is based on Sikora's contention that summary judgment was improper because a jury could have found that Wenzel had constructive notice of the defective nature of the deck. In this regard, Sikora points to the fact that Wenzel is an engineer and has been in the field of property management since 1975. Furthermore, Wenzel chose not to exercise his contractual right to an inspection at the time of closing or at any time before the accident. Sikora contends Wenzel would have learned of the dispute between the City and the contractor if he had not depended on the contractor and the City of Fairborn to insure compliance with appropriate codes.
We need not consider this assignment of error, given our finding that neither actual nor constructive notice is required to impose liability for a R.C. 5321.04(A)(1) violation. However, if we were required to resolve the issue of constructive notice, we would agree with the trial court that Wenzel did not have constructive notice of the defective condition of the deck. In this context, the pertinent inquiry is whether factual issues exist concerning Wenzel's ability to discover the defect in the deck construction, either by exercising proper diligence at the time of purchase or by properly inspecting the property during his ownership. See, e.g., Bussard v. Ohio Dept. of Transp. (Ohio Ct.Cl. 1986), 31 Ohio Misc.2d 1, 3 (noting definition of constructive notice in Black's Law Dictionary, (5 Ed. 1979), page 958 as "'information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.'")
After reviewing the record, we see no genuine issues of material fact concerning the issue of constructive notice. Although Wenzel did not have an independent inspection of the property made at the time of purchase, his reliance on the building contractor and city approval of the project was reasonable. Furthermore, although evidence might have been presented showing some dereliction in Wenzel's maintenance or inspection of the property over the ten years he owned it, the record is very sparse in this regard. All we know from the properly submitted documents and affidavits is that the deck appeared sturdy and did not appear to have been neglected. Moreover, the facts recited for the purpose of showing Wenzel had knowledge or experience beyond that of the normal purchaser of rental property (his status as an engineer and experience managing property) are not of record. The only deposition filed was that of Robert Price, which contains no information pertinent to Wenzel's actions. Wenzel's own affidavit also indicates nothing about his experience or the maintenance history of the deck. To the contrary, the affidavit only says that Wenzel knew of no defects in the deck.
Accordingly, based on the facts submitted by the parties, we can only conclude that Wenzel did not have constructive notice of the defective nature of the deck. As we have pointed out, the lack of constructive notice does not prevent Wenzel from being held strictly liable for the breach of statutory duty, or from being held liable on an imputed liability basis for the acts of the parties who negligently designed and/or constructed the deck.
Based on the preceding analysis, the second assignment of error is overruled.
In view of the above discussion, the first assignment of error is sustained and the second assignment of error is overruled. Accordingly, the trial court's judgment is reversed and remanded for further proceedings consistent with this opinion.
WOLFF, J., concurs.